# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs March 1, 2016


## STATE OF TENNESSEE v. CHRISTOPHER BROWN


### Appeal from the Criminal Court for Shelby County
### No. 13-05989     J. Robert Carter, Jr., Judge

_____


### No. W2015-00990-CCA-R3-CD  -  Filed April 12, 2016

_____


A Shelby County jury found the Defendant, Christopher Brown, guilty of one count of first degree premeditated murder and three counts of aggravated assault.  On appeal, the Defendant asserts that the trial court erroneously admitted evidence of prior bad acts under Rule 404(b) of the Tennessee Rules of Evidence and that the evidence presented at trial was insufficient to support his convictions.  Following a thorough review, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

Stephen C. Bush, District Public Defender; Tony N. Brayton (on appeal) and Robert Gowen and John Zastrow (at trial), Assistant District Public Defenders, Memphis, Tennessee, for the appellant, Christopher Brown.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Amy P. Weirich, District Attorney General; and Sam Winning and Jeff Jones, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

## I. Factual and Procedural Background

This appeal involves the shooting death of Albert Fips, which occurred on June 22, 2013, when the Defendant approached the SUV in which Mr. Fips and three others—Carolyn Pratcher, Ida Pratcher, and Michael Douglas—were riding and shot multiple times into the vehicle. The Shelby County Grand Jury subsequently indicted the Defendant for one count of first degree premeditated murder and three counts each of attempted first degree murder, employing a firearm in the commission of a dangerous felony, and aggravated assault.

*Rule 404(b) Hearing*

Prior to trial, the State filed a motion seeking to admit evidence of prior bad acts of the Defendant under Rule 404(b) of the Tennessee Rules of Evidence. Specifically, the State alleged that in October 2011, the Defendant assaulted Carolyn Pratcher—his then-girlfriend—which led to the Defendant's arrest for domestic assault. The State further alleged that, on June 4, 2013, the Defendant entered Mr. Fips's home uninvited and sent harassing text messages to Mr. Fips and Carolyn.[1] Then, on June 7, 2013, the Defendant slashed the tires on Mr. Fips's vehicle and later admitted responsibility for the vandalism to Carolyn. Finally, the State asserted that the Defendant again assaulted Carolyn on June 17, 2013, five days before the Defendant committed the indicted offenses.

At a pretrial hearing, the State argued that evidence regarding these instances of conduct were relevant to establishing the Defendant's intent and motive to commit the offenses charged in this case. The State explained that, one month before the shooting, the Defendant and Carolyn broke up, and Carolyn moved in with Mr. Fips. According to the State, the Defendant "wasn't happy about that, threatened [Carolyn] and Mr. Fips, slashed Mr. Fips['s] tires, threatened to kill [Mr. Fips] and ultimately made good on that threat."

Regarding the specific instances of conduct at issue, Carolyn testified that, on October 14, 2011, she was at the apartment she shared with the Defendant when she saw that some nearby apartments were on fire and called the fire department. When Carolyn informed the Defendant that she called the fire department, the Defendant said, "B****,

---

[1] Because several witnesses share a common surname, we will refer to some witnesses by their first name. No disrespect is intended.

you need to stay out of other people's business, I told you about that." Carolyn then exited her apartment, intending to go to the store to purchase cigarettes, but the Defendant "snatched" her by her hair, "dragged" her back up the stairs, and started hitting her. Carolyn testified that her children woke up during the assault and that one of her sons, flagged down police officers.[2] She explained that the Defendant was arrested that night and that officers took photographs of her injuries. She stated that the Defendant bit her finger and pulled hair out of her head and that she had scratches "all over [her] neck." Carolyn identified photographs of her injuries, and those photographs were entered into evidence as exhibits. Carolyn stated that she and the Defendant later moved to a house on Hanley Street. However, the Defendant soon kicked her out of the house, and she moved in with Mr. Fips, who lived on the same block on Hanley Street as the Defendant.

Next, Carolyn recalled an incident that occurred on June 4, 2013. She stated that the Defendant walked into Mr. Fips's residence unexpectedly, tapped Mr. Fips on the shoulder, and asked if he could "have a couple of words with him." The Defendant and Mr. Fips stepped outside and talked, but Carolyn did not hear what was said. Carolyn stated that she eventually called the police and reported that the Defendant had been sending her harassing text messages but that the Defendant was not arrested on this occasion.

Carolyn also testified that Mr. Fips's tires were slashed on June 7, 2013, and that Mr. Fips filed a police report about the incident. She stated that the Defendant later admitted to her that he slashed Mr. Fips's tires, although she could not recall exactly when the Defendant made the admission. She acknowledged that she never told the police that the Defendant said he slashed the tires.

As to the fourth incident, Carolyn testified that the Defendant called her on the day of their son's birthday—June 17, 2013—and told her that he wanted to give her some money for their son. However, when she went to the Defendant's house, the Defendant refused to give her the money. Instead, as she started to leave, the Defendant "started fussing and fighting," grabbed her by the neck, and tried to drag her back into the house. Carolyn stated that their son saw the assault from the street. She did not report the incident to police.

At the conclusion of the State's proof, the trial court, based upon Carolyn's testimony and the photographs, found by clear and convincing evidence that the October 14, 2011, assault occurred. The trial court commented that the incident was a "touch remote" but not "overly" so. The trial court determined that the event was admissible to

---

[2] Carolyn testified that she had three children—including a thirteen-year-old son with the Defendant and a sixteen-year-old son with Mr. Fips.

show the nature of the relationship between the Defendant and Carolyn and because it was relevant to issues such as the Defendant's state of mind and whether his shooting Carolyn was premeditated and intentional. However, the trial court stated that the photographs of Carolyn's injuries were not admissible and indicated that it would instruct the jury on the proper use of the evidence. Finally, the court weighed the danger of unfair prejudice and found that the incident was not "tremendously prejudicial, at all."

Regarding the incident on June 4, 2013, when the Defendant walked into Mr. Fips's residence unexpectedly and wanted to talk, the trial court stated, "I don't see how that is a crime, or really a bad act." The trial court noted that, because the Defendant shared a child with Carolyn, his presence at her house was not a bad act, regardless of whether she invited him there. The trial court also noted that the jury would hear "a fair amount" about the contentious relationship between the Defendant, Carolyn, and Mr. Fips at trial, from both the State and the defense, and that this evidence was relevant in establishing their history and to show the "awful situation" created by the parties' living on the same street. The trial court stated that it would allow the testimony to the extent that it was relevant but that it did not find it to be a Rule 404(b) issue. As to Carolyn's testimony regarding harassing text messages the Defendant allegedly sent Mr. Fips, the trial court ruled that there was no clear and convincing evidence that the Defendant sent Mr. Fips text messages or the exact content of the messages.

Regarding the incident on June 7, 2013, the trial court found, based upon Carolyn's testimony, that the tires on Mr. Fips's vehicle were slashed and that the Defendant admitted he did it. The court noted that this incident was "closer in time" to the shooting and determined that the evidence was material to the Defendant's "state of mind and the nature of this relationship between the parties." Finally, the trial court weighed the evidence and found that the evidence was not "particularly prejudicial."

As to the Defendant's assault on Carolyn on June 17, 2013, the trial court determined that Carolyn's testimony was admissible to the issue of the Defendant's intent, noting that Carolyn was a victim in one of the counts of attempted first degree murder. The court found that Carolyn's testimony would show a "complete picture" of the "volatile nature" of the relationship between the parties and provide insight on the Defendant's state of mind. Finally, in weighing the evidence, the trial court concluded that testimony about the June 17 assault was not "particularly prejudicial."

*Trial*

At trial, Carolyn Pratcher testified that the Defendant was the father of her thirteen-year-old son. She acknowledged that her relationship with the Defendant had been a difficult one. She stated that she lived with the Defendant until 2013, when he

- 4 -

kicked her out of their house on Hanley Street. Carolyn recalled that, before moving to Hanley Street, she and the Defendant had lived at Kingsgate Apartments in 2011. In October of that year, she and the Defendant had a disagreement that turned physical. Carolyn explained that there had been an apartment on fire next door and, when she told the Defendant about it, he said, "B****, I told you to stay out of other people's business." The Defendant started pulling her hair and dragging her upstairs. Although she got away from the Defendant and ran out the door, she did not want to leave her children there and went back for them. Her sixteen-year-old son eventually called the police, and the Defendant was arrested and later convicted in connection with the assault.

Carolyn recalled that sometime after this incident, she moved to Hanley Street with the Defendant. However, in June 2013, the Defendant "put [her] out," and she moved in with Mr. Fips, who lived four or five houses down from the Defendant. Carolyn testified that the Defendant began "sending text messages, threatening messages" thereafter.[3] She also recalled that, on one occasion after she moved in with Mr. Fips, the Defendant came into Mr. Fips's house unexpectedly. Mr. Fips told the Defendant to walk outside so they could talk. Once outside, the two men "had words," but they did not have a physical confrontation. Carolyn also stated that, around June 7, 2013, Mr. Fips's tires were slashed. The Defendant later admitted to Carolyn that he slashed Mr. Fips's tires.

Carolyn stated that she had additional problems with the Defendant on June 17, 2013. She explained that the Defendant called her and said that he was going to give her some money for their son's birthday. However, when she went to the Defendant's house to get the money, the Defendant grabbed her around the neck and tried to drag her into the house. The Defendant told her, "I'm going to get [your] a**[.]" Carolyn recalled that the Defendant only let her go when their son ran across the street. She stated that she had no physical injuries from this incident.

Carolyn testified that, on June 22, 2013, she went to the dog track with Mr. Fips; her aunt, Ida Pratcher; and another man, Michael Douglas. The group left the dog track between 9:00 p.m. and 10:00 p.m. Upon returning to Memphis, they stopped at Church's Chicken and a convenience store. Carolyn recalled that Mr. Fips was driving his SUV when they turned onto Hanley Street and she was sitting in the front passenger seat. As Mr. Fips drove past the Defendant's residence, Carolyn saw the Defendant sitting on his front porch. She recalled that Mr. Fips was driving past the Defendant "slowly" but that they did not say anything to the Defendant. The Defendant got off the porch and walked towards Mr. Fips's vehicle, shining a light from his cell phone towards them. Carolyn stated that, when Mr. Fips saw the light, he put the vehicle in reverse and backed up. Mr.

---

[3] At trial, the Defendant did not object to the testimony about the Defendant's text messages.

Fips rolled the driver's side window down and told the Defendant that he wanted to speak with him "man to man" about the text messages that the Defendant sent him. Carolyn testified, "[T]hat's when all the shooting just started." She explained that the Defendant stood about ten to fifteen feet away when he began shooting and that he shot into the vehicle approximately five times. Carolyn stated that neither she nor anyone else in Mr. Fips's vehicle had a weapon. Moreover, Mr. Fips did not own a gun and was not known to carry a gun.

Carolyn recalled that, when she heard the shots, she felt her arm "hurting and burning real bad" and that she tried to get out of the vehicle but that the door would not open. Carolyn said that Mr. Fips attempted to "drive off" but that he did not "make it in time enough." When she got her car door open after the third or fourth try, Carolyn got out of the SUV and stood beside it. She wanted to reach in for Mr. Fips, who was not moving, but she was afraid that the Defendant would shoot her again, so she ran behind an abandoned house. Carolyn recalled that the Defendant chased her around the abandoned house several times. She had been shot twice, was losing a lot of blood, and felt like she was going to pass out, so she stopped running. At that time, the Defendant caught up to her and grabbed her "around [the] neck." He had something in his hand, but she could not tell if it was a knife or a gun. Carolyn testified that there were people outside, and some were calling 911. The Defendant let her go and ran from the scene before police arrived. Carolyn spoke briefly to police and was then taken to the hospital.

According to Carolyn, the Defendant called her from California a couple of weeks after the shooting. During the call, the Defendant stated that he used a .22 to shoot her and Mr. Fips. The Defendant called Carolyn a second time after he was arrested and placed in jail. During the phone call, the Defendant encouraged her to change her story and tell police that Mr. Fips had a gun and that "it was self[-]defense."

On cross-examination, Carolyn acknowledged that there were other ways to get to Mr. Fips's house that did not involve driving past the Defendant's residence. She stated that, although Mr. Fips drove slowly down Hanley Street, he was not looking for the Defendant. She agreed that Mr. Fips was upset with the Defendant about the text messages that the Defendant had sent. She stated that Mr. Fips put his SUV in reverse and then in park and rolled his window down "the rest of the way" before he asked the Defendant if they could talk.

Carolyn's aunt, Ida Pratcher, testified that on the day of the shooting she went to a casino in Arkansas with Carolyn, Mr. Fips, and Michael Douglas. Ida recalled that the group stayed at the casino for about an hour and a half and then returned to Memphis around 10:00 p.m. On the way home, Mr. Fips stopped at a store and at Church's Chicken. Ida recalled that, as Mr. Fips drove down Hanley Street, she saw the Defendant

sitting on the porch of his house. When Mr. Fips saw the Defendant, he said, "[d]amn," stopped the vehicle, and starting backing up. Mr. Fips said that the Defendant wanted to talk to him, and when Mr. Fips stopped, the Defendant came off the porch towards them. Mr. Fips asked the Defendant why the Defendant was following him and texting his phone. Ida stated that Mr. Fips was "fixing to open the door," and she thought that the Defendant came to the truck and "pushed, shut the door back up." According to Ida, the Defendant told Mr. Fips, "I told you mother f***** when I see you . . . mother f***** when I texted you I told you mother f***** when I see you again, I'm going to kill you." Then, the Defendant "started shooting." Ida testified that she was in the back seat behind Mr. Fips and Mr. Douglas was in the back seat behind Carolyn. When the Defendant began shooting into the truck, Ida "duck[ed]" down and yelled at Mr. Douglas to get out of the car. Ida heard Mr. Fips saying "ouch, ouch" and then saw him fall over. Ida testified that, as she followed Mr. Douglas out of the vehicle, she fell and hurt her knee and that the vehicle ran over the side of her foot. The vehicle then coasted down the street and ran into a curb before stopping. Ida stated that no one inside Mr. Fips's vehicle had a gun, that no gunshots came from inside the vehicle, and that she was in fear when the Defendant started shooting.

Following the shooting, Ida was transported to the hospital and treated for a fractured ankle. She also identified the Defendant in a photo lineup that night. On cross-examination, Ida stated that she did not know if Mr. Fips put the vehicle in park before the shooting began. She also said that the Defendant never pointed the gun directly at her or Mr. Douglas.

Michael Douglas testified that he lived next door to Mr. Fips for the five months preceding Mr. Fips's death. Mr. Douglas recalled that, on the day of the shooting, he went with Mr. Fips, Carolyn, and Ida to the dog track and estimated that they returned to Memphis around 10:00 p.m. Before going home, the group stopped at a liquor store, a convenience shop, and Church's Chicken. Mr. Douglas stated that, before leaving the parking lot of Church's Chicken, Mr. Fips looked at his cell phone and turned to Carolyn and asked, "[H]ow did he get my number?"

Mr. Douglas recalled that, on Hanley Street, Mr. Fips "coasted" by the Defendant's house. Mr. Douglas heard Carolyn say, "[N]o you don't have to do it like this here," and then he saw someone "just shooting at the car[.]" Mr. Douglas testified that he heard approximately three gunshots. He stated that he did not know the Defendant and could not identify the shooter because it was "dark down there." Mr. Douglas recalled that he tried to open his door when the shooting started but the door would not open. He said Ida yelled at him to "get out of the car" and that they pushed at each other while trying to exit the vehicle. Mr. Douglas testified that he was afraid and that he fell after getting out of the vehicle. He then ran from the scene. Mr. Douglas

testified that he did not have a weapon and that no one else inside the vehicle had a weapon. He further stated that he never knew Mr. Fips to carry a gun.

On cross-examination, Mr. Douglas testified that Mr. Fips purchased two small bottles of liquor while at the corner store. He recalled that, when they were ready to leave Church's Chicken, Mr. Fips took one of the bottles and "took a swallow of it[.]" Mr. Fips was looking at his cell phone, and he asked Carolyn, "[H]ow did he get my number?" Mr. Douglas agreed that it was dark outside by the time they returned to Hanley Street. He agreed that the interior light of Mr. Fips's vehicle was off and that the driver's window was partially down. Mr. Douglas recalled that Mr. Fips coasted down Hanley Street slowly, but he did not recall Mr. Fips's putting the vehicle in reverse before the shooting began. Mr. Douglas agreed that there were other ways to get to Mr. Fips's house from Church's Chicken other than going past the Defendant's residence.

Carolyn and the Defendant's thirteen-year-old son testified that, on June 17, 2013, he was standing across the street from the Defendant's house when he saw the Defendant drag his mother "to the back of the house[.]" When he ran across the street to confront the Defendant, the Defendant "walked off." He testified that the Defendant had his hands around Carolyn's neck.

Officer Joseph Cunningham of the Memphis Police Department testified that, on June 22, 2013, he received a call around 11:00 p.m. to respond to Hanley Street for a report of a shooting. Upon arrival, he saw an SUV on the west side of the street, which had struck another vehicle. Inside the SUV, there was a male victim slumped over in the front seat. Carolyn ran off the porch of a house on the other side of the street and approached his patrol car. She was crying and frantic and told Officer Cunningham that she had been shot twice by her ex-boyfriend, the Defendant. He testified that he recognized Carolyn from a previous call earlier that month and that he sat her down to await an ambulance. Officer Cunningham returned to the area of the Defendant's residence several times following the shooting, but he never saw any sign of the Defendant's presence at the house.

Officer David Wagner of the Memphis Police Department testified that he was on duty on June 22, 2013, when he received a call of a shooting on Hanley Street. When he arrived at the scene, he spoke to Ida, who was "very hysterical" and lying on the sidewalk with an injury to her ankle. Ida told Officer Wagner that, when the shooting started, she jumped out of Mr. Fips's vehicle while the vehicle was in motion and that the vehicle ran over her foot. Ida identified the Defendant as the shooter. She told Officer Wagner that the Defendant came up to Mr. Fips's vehicle, said "I told you I'd shoot you," and began shooting into the vehicle.

Officer Marcus Mosby testified that he was assigned to the Memphis Police Department's crime scene investigation unit and that he responded to the shooting call on Hanley Street. Officer Mosby stated that, when he arrived, he saw a deceased man lying across the front seat of a gray SUV. Officer Mosby made a sketch of the crime scene, photographed the scene, and collected evidence from the area. Specifically, Officer Mosby photographed and collected a cell phone, lighter, and "drink cup," which were sitting on the front porch of the Defendant's house. He also collected a cell phone from inside the gray SUV.

Sergeant Clarence Mabon, the case officer assigned to the investigation of the homicide of Mr. Fips, testified that he was initially forwarded a felony response packet that provided him with information about the offense. From the packet, Sergeant Mabon learned that the Defendant was named as the suspect by the surviving victims at the scene. Sergeant Mabon reviewed the crime scene reports, victims' statements, and the evidence collected from the scene. Specifically, Sergeant Mabon recalled that a cell phone belonging to the Defendant was recovered from the porch of the Defendant's house on Hanley Street. He stated that he later recovered Carolyn's cell phone and, through a search warrant, he was able to obtain information off of both phones. Sergeant Mabon testified that he found text messages on Carolyn's phone that had been received from the cell phone recovered from the Defendant's porch. The sergeant was shown a photograph of one text message that was received by Carolyn on June 22, 2013, at 7:21 p.m. and read, "I'm fixin' to kill myself. They will find me dead in this house when police break in I'll be gone. F*** it." Sergeant Mabon was then shown a second photograph of a text message that was received at 9:59 p.m. on June 22, 2013, which said, "Dude, no what's up. It's time to roll. Real talk. You need to go somewhere fast. You say you want and love me. Make your move. This is not living." The photographs of the text messages were shown to the jury as Sergeant Mabon read them aloud.

Sergeant Mabon recalled that he sent out an alert to law enforcement that he was looking for the Defendant. He received a phone call several hours after the shooting from someone who identified himself as the Defendant. The Defendant said that he was in the Whitehaven area and that he wanted to turn himself in after he saw his mother. The Defendant also told Sergeant Mabon that he "didn't think he did anything wrong" and that "the guy made a pistol play" and he was scared. After several hours, Sergeant Mabon tried to call the Defendant back, but another man answered the phone. The man said that he had allowed an employee to use his phone and that the employee allowed "somebody else to use the phone." Sergeant Mabon testified that it was several months later before the Defendant was brought back to Memphis after being found in California by the United States Marshals Service.

Dr. Miguel Laboy testified that he worked in the Office of the Medical Examiner in Memphis and that he performed Mr. Fips's autopsy. Dr. Laboy determined the cause of death to be multiple gunshot wounds. Specifically, he found that Mr. Fips had two gunshot wounds to the chest, a gunshot wound to the right arm and buttock, and grazing wounds to the left hand and left arm. Dr. Laboy explained that the gunshot wounds to the chest fractured Mr. Fips's ribs and perforated his lungs and heart.

Following deliberations, the jury found the Defendant guilty of first degree premeditated murder and three counts of aggravated assault.[4] For these offenses, the trial court sentenced the Defendant to life plus ten years.

Thereafter, the Defendant filed a motion for new trial and an amended motion for new trial. Following a hearing, the trial court entered a written order denying the Defendant's motion for new trial. This timely appeal followed.

## II. Analysis

*Rule 404(b)*

The Defendant contends that the trial court erroneously allowed the jury to consider evidence of prior bad acts and argues that the probative value of the evidence was "clearly outweighed" by the danger of unfair prejudice. The State responds that the trial court acted within its discretion in admitting evidence of prior acts of the Defendant to show the Defendant's motive and intent. We agree with the State.

Rule 404(b) of the Tennessee Rules of Evidence provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

> (1) The court upon request must hold a hearing outside the jury's presence;

---

[4] Before trial, the State entered a *nolle prosequi* on two counts of attempted first degree murder and two counts of employing a firearm in the commission of a dangerous felony. The jury acquitted the Defendant of the remaining counts of attempted first degree murder and employing a firearm in the commission of a dangerous felony.

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

See also State v. Thacker, 164 S.W.3d 208, 240 (Tenn. 2005); State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985). Rule 404(b) is generally one of exclusion, but exceptions to the rule may occur when the evidence of the otherwise inadmissible conduct is offered to prove the motive of the defendant, identity, intent, the absence of mistake or accident, opportunity, or a common scheme or plan. State v. Toliver, 117 S.W.3d 216, 230 (Tenn. 2003); State v. McCary, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). In addition to these exceptions, evidence of other acts may be admitted to provide the jury with necessary contextual background. State v. Gilliland, 22 S.W.3d 266, 272 (Tenn. 2000); see also Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[13] (6th ed. 2011) (evidence admissible to tell the "complete story").

If the trial court substantially complies with the procedural requirements of Rule 404(b), we will review the trial court's determination for an abuse of discretion. Thacker, 164 S.W.3d at 240 (citing State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997); State v. Baker, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1990)). However, if the trial court fails to substantially comply with the requirements of the rule, then the trial court's decision should be afforded no deference by the reviewing court. DuBose, 953 S.W.2d at 652.

As an initial matter, the Defendant contends that the trial court failed to substantially comply with the procedural requirements of Rule 404(b) and, therefore, the trial court's ruling should be afforded no deference by this court. We disagree. The record reflects that the trial court conducted a jury-out hearing, determined that material issues existed other than conformity with a character trait, found that the proof of the bad acts was clear and convincing, and weighed the probative value against the danger of unfair prejudice—all in substantial compliance with the requirements of Rule 404(b).

Prior Assaults on Carolyn Pratcher

The Defendant asserts that the trial court abused its discretion by admitting evidence of assaults that he committed against Carolyn on October 14, 2011, and June

- 11 -

17, 2013. He contends that this evidence served only to show his propensity for violence; that the October 2011 assault was "too remote" to be relevant to the issue of his intent on the night of June 22, 2013; that the nature of the relationship between the Defendant and Carolyn was not at issue; and that the trial court failed to weigh the probative value of the evidence against the prejudice to the Defendant.

At the conclusion of the Rule 404(b) hearing, the trial court ruled that evidence of the Defendant's assault on Carolyn in October 2011 was admissible to show the nature of the relationship between the Defendant and Carolyn and because it was relevant to issues such as the Defendant's state of mind and whether his shooting Carolyn was premeditated and intentional. Regarding the June 22, 2013, assault, the trial court concluded that the evidence was admissible to the issue of the Defendant's intent. The trial court also found that testimony about this incident would show the "volatile nature" of the relationship between the parties and provide insight on the Defendant's state of mind.

Tennessee courts have accepted the use of evidence of a defendant's prior violent acts against a victim of a violent crime as a means of allowing the State the opportunity to establish intent. See State v. Smith, 868 S.W.2d 561, 574 (Tenn. 1993); see also State v. Gilley, 297 S.W.3d 739, 758 (Tenn. Crim. App. 2008); State v. Turnbill, 640 S.W.2d 40, 46-47 (Tenn. Crim. App. 1982). The courts posit that such evidence is probative of the defendant's *mens rea* because it reveals a "settled purpose" to harm the victim. Smith, 868 S.W.2d at 574. Specifically, our supreme court has ruled that "[v]iolent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." Id. The Defendant argues that the only purpose for introducing evidence of his assaults against Carolyn was to show a propensity for violence against her. We agree with the Defendant that evidence is admissible pursuant to Rule 404(b) only when it is probative of a material issue other than "conduct conforming with a character trait." See Tenn. R. Evid. 404(b)(2). However, the Defendant was indicted for attempted first degree premeditated murder of Carolyn, and the State's theory was that the Defendant approached the vehicle in which Carolyn and Mr. Fips were riding and fired multiple times into the vehicle, striking Carolyn twice. The State was required to prove that the Defendant's actions were "premeditated and intentional." See Tenn. Code Ann. § 39-13-202(a)(1). In our view, evidence of the Defendant's prior assaults of Carolyn established the nature of their relationship and the Defendant's hostility toward the victim and settled purpose to harm the victim. The trial court properly admitted the evidence at trial on this basis.

Additionally, while the trial court commented that the October 2011 incident was a "touch remote," it determined that it was not "overly" remote, and we agree with this

assessment. Moreover, "remoteness affects only the weight, not the admissibility of the evidence." State v. Marlon Duane Kiser, No. E2005-02406-CCA-R3-DD, 2007 WL 4207903, at *39 (Tenn. Crim. App. Nov. 29, 2007) (quoting State v. Smith, 868 S.W.2d 561, 575 (Tenn. 1993)) (internal quotations marks omitted). The nature of the relationship between the Defendant and Carolyn was at issue at trial, despite the Defendant's claim to the contrary on appeal. During his opening statement to the jury, defense counsel asserted:

> At the center of this tragedy is a triangle of a tumultuous relationship between . . . [Mr.] Fips, and the defendant . . . and Carolyn Pratcher. Ms. Pratcher has children through both [the Defendant] and Mr. Fips and in weeks leading up to the night of the shooting, she had stayed with both of them.

Defense counsel also stated that the main issue was what the Defendant was thinking when he committed the shooting. Thus, the relationship between the parties was squarely at issue during the trial. Finally, the trial court weighed the probative value of the evidence against the prejudice to the Defendant and found that the evidence was not "particularly prejudicial." The trial court acted within its discretion in admitting evidence of the Defendant's prior assaults on Carolyn.

### Entering Mr. Fips's Residence

The Defendant next contends that the incident, wherein he unexpectedly entered Mr. Fips's residence, tapped Mr. Fips on the shoulder, and asked if he could "have a couple of words with him," had no relevance to any matter at issue in the trial and should have been excluded from proof. In addressing this issue, the trial court concluded that the Defendant's behavior was not "really a bad act" and found that it was relevant because it shed light on the relationship between the Defendant, Carolyn, and Mr. Fips and the "love triangle situation" that served as a motive for the shooting. We agree with the trial court that the incident, as described by Carolyn, was not a "bad act." Carolyn testified that Mr. Fips stepped outside with the Defendant to talk but that she could not hear their conversation. She further stated that there was no physical confrontation between the two men. Regardless, even if we were to conclude that this qualified as a prior bad act for purposes of Rule 404(b), the trial court did not err in admitting the evidence. The strategy of both the State and the defense was to establish the tumultuous history between the Defendant, Carolyn, and Mr. Fips, and this incident was probative of the type of relationship that existed between the parties. Moreover, the prejudice to the Defendant was minimal as there was no evidence that the Defendant was violent or attempted a physical confrontation. Accordingly, the trial court acted within its discretion in admitting testimony about this incident into evidence.

Slashing Mr. Fips's Tires

At the conclusion of the Rule 404(b) hearing, the trial court found that the Defendant slashed Mr. Fips's tires on June 7, 2013, and determined that the evidence was material to the Defendant's "state of mind and the nature of this relationship between the parties." The trial court noted that this incident was "closer in time" to the shooting and, in weighing the evidence, concluded that it was not "particularly prejudicial."

The Defendant contends that the State failed to establish that he slashed Mr. Fips's tires by clear and convincing evidence. However, Carolyn testified that the incident took place and that the Defendant admitted to her that he was responsible for the vandalism, and the trial court accepted her testimony as clear and convincing evidence. The Defendant argues that Carolyn's testimony is not credible because she failed to report the incident to police. However, when a trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015) (citing Gilley, 297 S.W.3d at 759-61). The record in this case does not preponderate against the trial court's findings.

In conclusion, the record reflects that the trial court substantially complied with the requirements of 404(b) by conducting a jury-out hearing, determining that a material issue other than conformity with a character trait existed, that the proof of the bad acts was clear and convincing, and that the probative value outweighed the danger of unfair prejudice. The challenged evidence demonstrated the Defendant's hostility towards Mr. Fips and Carolyn, and it was probative of the nature of the relationship between the three parties and of the Defendant's intent on the night of the shooting. The trial court did not abuse its discretion by admitting the evidence, and the Defendant is not entitled to relief.

*Sufficiency of the Evidence*

The Defendant also contends that the evidence is insufficient to support his convictions for first degree premeditated murder and three counts of aggravated assault. He argues that the State failed to establish the requisite intent necessary for the convictions. The State responds that, when viewed in the light most favorable to the State, the evidence is sufficient to support the Defendant's convictions. We agree with the State.

The applicable standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any*

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997) (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)). Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

In a jury trial, the weight and credibility given to the testimony of witnesses, as well as the reconciliation of conflicts in that testimony, are questions of fact best determined by the jury, because they saw and heard the witnesses, and by the trial judge, who concurred in and approved the verdict. Bland, 958 S.W.2d at 659. This court will not reweigh the evidence. Id. On review, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

First Degree Premeditated Murder

As to his conviction for first degree premeditated murder, the Defendant argues that the evidence is insufficient because there was no proof that he made preparations to conceal the crime, previously formed the intent to kill Mr. Fips, or procured a weapon for the purpose of killing the victim. He argues that he was scared and acting in self-defense when he made the "spontaneous and impulsive decision to shoot Mr. Fips."

Premeditated first degree murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1) (2012). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (2012). Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d) (2012). Additionally, "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." Id. Premeditation "may be established by proof of the circumstances surrounding the killing." State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). Moreover, there are several factors which tend to support the existence of premeditation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was

particularly cruel, declarations of an intent to kill by the defendant, evidence of procurement of a weapon, the making of preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing.  Id.  Whether premeditation is present in a given case is a question of fact to be determined by the jury from all of the circumstances surrounding the killing.  State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003) (citing Suttles, 30 S.W.3d at 261; State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998)).

When viewed in the light most favorable to the State, the evidence at trial established that the Defendant and Carolyn broke up about a month before the shooting, and she moved in with Mr. Fips, who lived a few houses down from the Defendant.  The Defendant was clearly unhappy with the situation and had slashed Mr. Fips's tires, sent him harassing and threatening text messages, assaulted Carolyn, and threatened to kill Mr. Fips in the weeks leading up to June 22, 2013.  As Mr. Fips drove past the Defendant's residence on the night of the shooting, the Defendant was sitting on the front porch of the residence.  The Defendant got up off the porch and walked towards Mr. Fips's vehicle, shining the flashlight from his cell phone on the vehicle.  When Mr. Fips told the Defendant that he wanted to talk "man to man," the Defendant responded, "I told you mother f***** when I see you . . . mother f***** when I texted you I told you mother f***** when I see you again, I'm going to kill you."  The Defendant then shot at least five times into the vehicle, striking Mr. Fips twice in the chest.  The proof established that Mr. Fips was unarmed and was not known to carry a gun.  Following the shooting, the Defendant fled the scene and eventually the state.  He was apprehended in California months later.  The Defendant later called Carolyn and asked her to change her story and tell police that he acted in self-defense.  While the Defendant contends that, by driving past his home at a low rate of speed, Mr. Fips provoked the Defendant, no evidence suggests that Mr. Fips in any way provoked the Defendant.  Additionally, while the Defendant argued at trial that he was in fear of Mr. Fips at the time of the shooting, the jury soundly rejected his claim of self-defense.  Based upon this evidence, we conclude that the jury could reasonably find that the Defendant's killing of Mr. Fips was a premeditated and intentional act and that the Defendant was sufficiently free from excitement and passion.  The Defendant is not entitled to relief.

Aggravated Assault

Regarding his convictions for aggravated assault, the Defendant asserts that the State failed to establish that he intended to cause Carolyn, Ida, and Mr. Douglas to fear imminent bodily injury.  He argues that he never pointed the weapon at Ida and Mr. Douglas and never threatened them.  The Defendant further contends that Carolyn was injured only by "bullets that passed through Mr. Fips and not b[y] gunfire that was directed at her[.]"

The indictment for Count 8 charges that the Defendant "did unlawfully and knowingly commit an assault on Carolyn Pratcher and use or display a deadly weapon and cause bodily injury to the said Carolyn Pratcher . . . ." The indictment for Count 9 charges that the Defendant "did unlawfully and knowingly commit an assault on Ida Pratcher and use or display a deadly weapon and cause said Ida Pratcher to reasonably fear bodily injury . . . ." The indictment for Count 10 is identical to Count 9 except the named victim is Michael Douglas.

Thus, as charged in Counts 8, 9, and 10, a person commits aggravated assault when he knowingly commits an assault, and the assault involved the use or display of a deadly weapon. Tenn. Code Ann. § 39-13-102(a)(1)(ii) (2012). A person commits assault when he intentionally or knowingly causes bodily injury to another or intentionally or knowingly causes another to reasonably fear imminent bodily injury. Tenn. Code Ann. § 39-13-101(a)(1)-(2) (2012). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). "When acting knowingly suffices to establish an element, that element is also established if a person acts intentionally." Tenn. Code Ann. § 39-11-301(a)(2).

When viewed in the light most favorable to the State, the evidence was sufficient to support the Defendant's convictions for three counts of aggravated assault. Regarding the assault on Carolyn, the State established that the Defendant had threatened and assaulted Carolyn in the weeks leading up to the shooting. Just five days before the shooting, the Defendant grabbed Carolyn around the neck and tried to drag her into his house. Although the Defendant stopped the assault when their son ran across the street, the Defendant told Carolyn, "I'm going to get [your] a**[.]" Carolyn was riding in the front seat beside Mr. Fips at the time of the shooting. Mr. Fips's window was rolled down, and the Defendant was shining a light from his cell phone towards the vehicle. The Defendant shot into the vehicle multiple times, and Carolyn was struck in the arm and in the leg. After she got out of the vehicle and ran behind the vehicle, the Defendant chased Carolyn around an abandoned house. While the Defendant maintains that he fired his weapon only at Mr. Fips, a reasonable trier of fact could infer from the evidence that the Defendant intended to shoot Carolyn as well. The Defendant also claims that the bullets that struck Carolyn passed through Mr. Fips first. However, the Defendant failed to establish this at trial. When Carolyn was asked on cross-examination if she got shot "through" Mr. Fips, Carolyn said that she did not know how she got shot—just that the Defendant was the person shooting. In any event, under the indictment, the State was required to prove only that the Defendant acted knowingly with respect to the aggravated

assault against Carolyn. Based upon this evidence, it was reasonable for the jury to conclude that the Defendant either intended to use a deadly weapon to cause bodily injury to Carolyn or was aware that his conduct of shooting into the front seat of the vehicle where Carolyn was sitting beside Mr. Fips was reasonably certain to result in bodily injury to Carolyn.

Additionally, the evidence showed that the Defendant acted at least knowingly in causing Ida and Mr. Douglas to reasonably fear imminent bodily injury. Before the shooting, the Defendant approached Mr. Fips's vehicle while shining a light from his cell phone at the SUV. Ida testified that the Defendant got close enough to the SUV to push the driver's door closed. A reasonable juror could infer from this proof that the Defendant had the time and opportunity to see who was in the vehicle. Additionally, Ida and Mr. Douglas testified that the Defendant placed them in fear by shooting the gun into the car. As the Defendant began to fire into the vehicle, Ida yelled at Mr. Douglas to open the door, and both of them frantically struggled to exit the vehicle and escape the Defendant. Thus, although the Defendant's intent may have been to shoot Mr. Fips and Carolyn, the evidence demonstrated that the Defendant was aware that his conduct, *i.e.*, using a deadly weapon to shoot into Mr. Fips's vehicle, was reasonably certain to cause the other passengers in the vehicle to reasonably fear imminent bodily injury. When viewed in the light most favorable to the State, the evidence was sufficient to support the Defendant's convictions for three counts of aggravated assault. This issue is without merit.

### III. Conclusion

For the aforementioned reasons, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 18 -